(R.D. 11703)

CONTROL DATA CORPORATION *v.* UNITED STATES

Entry Nos. 1936, etc.

(Decided May 20, 1970)

*Baker & McKenzie* (*William D. Outman, II,* and *Walter A. Slowinski* of counsel) for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Bernard J. Babb,* trial attorney), for the defendant.

FORD, Judge: These appeals for reappraisement listed in schedule "A," annexed hereto and made a part hereof, were consolidated for purposes of trial, and involve merchandise which is parts of electronic computers. Specifically, the merchandise consists of inner and outer memory planes and extended core mats which were exported from Hong Kong during the period from November 1965 to October 1966 after being assembled there from components fabricated in the United States.

The merchandise was appraised on the basis of constructed value as defined in section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165. Plaintiff claims the imported merchandise is properly dutiable on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, or in the alternative, constructed value as defined in section 402(d) of said act.

As regards plaintiff's claim under export value, plaintiff contends the dutiable value is the invoiced and entered value of the merchandise less the value of the components fabricated in the United States. With respect to the alternative claim under constructed value, the dispute between the parties centers on the amount of profit entering into said value.

The relevant statutory provisions are as follows:

Section 402(a) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 943:

> (a) Basis.—Except as otherwise specifically provided for in this Act, the value of imported merchandise for the purposes of this Act shall be—
>
> (1) the export value, or
>
> (2) if the export value cannot be determined satisfactorily, then the United States value, or
>
> (3) if neither the export value nor the United States value can be determined satisfactorily, then the constructed value;

\* \* \* \* \* \* \*

Section 402(b) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 943:

> (b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and

all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(d) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 944:

(d) Constructed Value.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) The cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

Section 402(f) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 944:

(f) Definitions.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

\* \* \* \* \* \* \*

Section 402(g) of the Tariff Act of 1930, 46 Stat. 708, as amended by the Customs Simplification Act of 1956, 70 Stat. 945:

(g) Transactions Between Related Persons.—

(1) For the purposes of subsection (c)(1) or (d), as the case may be, a transaction directly or indirectly between persons spec-

ified in any one of the subdivisions in paragraph (2) of this subsection may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise of the same general class or kind as the merchandise undergoing appraisement. If a transaction is disregarded under the preceding sentence and there are no other transactions available for consideration, then, for the purposes of subsection (d), the determination of the amount required to be considered shall be based on the best evidence available as to what the amount would have been if the transaction had occurred between persons not specified in any one of the subdivisions in paragraph (2).

(2) The persons referred to in paragraph (1) are:

\* \* \* \* \* \* \*

(F) Two or more persons directly or indirectly controlling. controlled by, or under common control with, any person.

Tariff Schedules of the United States Annotated (1969)

Schedule 8.—Special Classification Provisions
Part 1. – Articles Exported and Returned

| | |
|---|---|
| 807.00 Articles assembled abroad in whole or in part of fabricated components, the product of the United States, which (a) were exported in condition ready for assembly without further fabrication, (b) have not lost their physical identity in such articles by change in form, shape, or otherwise, and (c) have not been advanced in value or improved in condition abroad except by being assembled and except by operations incidental to the assembly process such as cleaning, lubricating, and painting_____ | A duty upon the full value of the imported article, less the cost or value of such products of the United States (see headnote 3 of this subpart) |

The record herein consists of the testimony of six witnesses and seven exhibits all offered on behalf of the plaintiff. This record gives a complete picture of the nature of the importations, the component materials, the sources and cost thereof, the relation between the importer and the exporter (assembler), the logistics and costs of assem-

bly, and the conflicting methods of computing the profit component of constructed value. The six witnesses whose testimony will be hereinafter summarized were Mr. Gale A. Jallen, manager of advanced electronics for the plaintiff; Mr. E. Douglas Larson, director and manager of remote sites; Mr. M. E. Ramsdell, manager of product costs; Mr. Richard D. Langer, corporate traffic manager; Mr. James E. Erickson, legal assistant to the treasurer, and Mr. Albert J. Lavoie, import specialist, United States Customs Service.

Mr. Jallen testified primarily with regard to the nature of the importations specifically, the internal memory plane assembly represented by plaintiff's exhibit 1 and the outer plane assembly represented by plaintiff's exhibit 2. To the laymen, these articles appear to be flat constructions approximately 4 inches square consisting of two portions; a central section approximately 2½ inches square composed of very fine wire mesh, and a 1 inch border or frame area containing printed circuits. Mr. Jallen stated that these articles were used in the 6600 computer, central memory, in stacks consisting of 10 inner assemblies and 2 outer assemblies.

The individual component materials involved in an assembly are, in the central section, copper magnetic wires and small doughnut shaped metal pieces known as ferrite cores and, in the outer section, a printed circuit board. The outer assembly represented by plaintiff's exhibit 2 differs slightly in the shape of its circuit board and the pattern of its etched circuitry.

Mr. M. E. Ramsdell, Jr., elaborated further on the sources of the component materials and their costs. He stated that the ferrite cores were purchased by plaintiff from the Electronics Division of Indiana General Corporation at an initial cost of $7 per thousand. He noted there were 4,096 such cores in a single 6600 memory plane. He further stated the wire used in the memory planes was purchased at a cost of $3 per pound and each plane contained about 0.02 pound. The printed circuit frames were purchased from Midwest circuits at a cost of $5.26 each for the inner plane's frame and $5.59 for the outer plane's frame.

The witness stated the cores for extended memory mats were purchased from a concern known as Ferroxcube at a price of $2.60 per thousand which price rose to $3 per thousand due to certain penalties in the contract with the supplier. He explained that there were about 499,700 cores in a single extended core mat and that its price was $1,499. The copper wire used in the extended core mat was purchased from three sellers, Molecu, Showa, and Phelps-Dodge at a price of $3 per pound which applied to the three-tenths of a pound used in each mat yields a cost of 90 cents per unit for that component.

Mr. Ramsdell further testified that the materials discussed above were never sold to the assembler (hereafter Waltek). It was plaintiff's

policy, for the purpose of controlling quality and specifications and the reasons of economy, to consign the materials to Waltek and return the articles to inventory when they were returned in assembled form. The cost to the plaintiff of maintaining an inventory of materials, known as "material burden" was approximately 10 percent and was applied upon the return of the fabricated part to inventory.

Mr. Larson's testimony was devoted principally to the arrangements made between plaintiff and Waltek regarding the assembly of the articles in dispute. He stated that during the period in dispute, Waltek was a wholly owned subsidiary of plaintiff, having been obtained in November 1965. Plaintiff's relations with Waltek began in 1964 with a sample order of 25 memory planes assembled for a price of $26 each. Thereafter, the assembly price dropped to $18.64 for larger quantities and again to $17.39. During that period, Waltek payed for transportation and import duties. After plaintiff's acquisition of Waltek, the price dropped to $14.66 with plaintiff assuming the cost of shipping, import duties, and insurance.

In addition, Mr. Larson testified that subsequent to plaintiff's acquisition of Waltek, it ceased to assemble memory planes for such competing firms as R.C.A. and Data Products. He further stated that during the period covering the importations at issue, a number of other companies were involved in similar assembly operations in Hong Kong, among them Ampex Corporation, Lockheed Electronics, Electronic Memories, Inc., and Fabri-Tek, Inc. The witness further testified that the cost of materials supplied by plaintiff for assembly dropped during the period after the acquisition of Waltek due primarily to plaintiff's establishing its own facility for the manufacture of the cores and certain minor changes in the cost of printed circuits.

Mr. Langer supplemented the above testimony with details regarding the shipping costs incurred in sending the materials to Waltek and returning the assembled memory planes to the plaintiff. He testified that such costs for the memory planes were 48 cents each and for the extended core mats $1 each. These costs covered shipping, insurance and packaging to and from Waltek.

The remaining testimony related to the issue of constructed value. Mr. Ericson testified that he sent four letters, introduced in evidence as plaintiff's collective exhibit 3, to Ampex Corporation, Fabri-Tek, Electronic Memories, and Lockheed Aircraft International requesting information as to whether they manufactured or assembled memory core mats in Hong Kong, the amount of profit realized in the assembly of these products and, in the event they purchased completed memory planes from an unrelated Hong Kong supplier, the name of said supplier for the purpose of direct inquiries.

The replies received from these companies were introduced in evidence as plaintiff's collective exhibit 4. They uniformly affirm the existence of Hong Kong subsidiaries used in the fabrication of memory planes. They all declined to reveal specific information regarding the profit structure of the assembly operation.

The final witness, Mr. Lavoie, testified with regard to the procedures entailed in the valuation of the importation at issue. Pursuant to his duties as an import specialist, on or about March 22, 1966, he requested certain information from plaintiff regarding the costs of assembling memory planes. He received a letter from plaintiff in response to this request setting forth the following information:

| | |
|---|---:|
| Direct labor | $2. 63 |
| Overhead, general & administrative expenses and selling expenses | 6. 57 |
| Profit | 5. 47 |
| Total per plane assembly | $14. 66 |
| | [$14.67] |

Mr. Lavoie sent plaintiff a Customs Form 5555 (entitled Notice of Action – Increase in Duties) dated April 21, 1966, which set forth that appraisement of the memory planes would be on the basis of constructed value in the manner indicated on the attached sheet. The form and the attached sheet were introduced in evidence as plaintiff's collective exhibit 5. The attachment reads as follows:

Computation of appraised value:

1. Cost of U.S. goods ex-U.S. plant

 Plus: frt, brokerage, ins., to foreign factory
 Direct labor
 General Expenses

2. The profit percentage applied on the above was computed by adding the foreign factory's cost of direct labor and the general expenses and dividing this total into the foreign factory's dollar figure for profit.

 All the above added together make up constructed value for appraisement purposes.

The figures used in our computation were supplied by you in your letters dated March 22 and 24, 1966.

Mr. Lavoie restated the formation contained in the above attachment and further identified a specific example of the above formula's application as embodied in a work sheet supplied to the plaintiff and introduced in evidence as plaintiff's collective exhibit 6. This sheet was given to representatives of the plaintiff by Mr. Lavoie and the figures contained therein apply directly to some of the entries in-

volved. The *method* of computation applies to all the entries in dispute. The sheet itself is set forth below:

### DETERMINE PERCENT OF PROFIT PRIOR TO "WORKING" CONSTRUCTED VALUE.

| | | |
|---|---|---|
| Direct labor | (1) | $2. 63 |
| Overhead, Genl and Admin expenses, and selling expenses | (2) | 6. 57 |
| Profit | (3) | 5. 47 |

| | |
|---|---|
| Total remittance | $14. 66 [$14.67] |

% of profit is determined by dividing the total costs (1) and (2) into the profit figure (3).

| | | |
|---|---|---|
| 1 and 2 total | $9. 20 | |
| 3 | 5. 47 | 59. 46% profit. |

Having found percent of profit then work constructed value net cost of U.S. Goods sent abroad $33. 56
Add frt, brokerage, ins. to fgn factory . 48

| | | |
|---|---|---|
| totals | | 34. 04 |
| direct labor | 2. 63 | |
| genl exp | 6. 57 | 9. 20 |
| profit 59.46% applied on total of 34.04 and 9.20 which is | 43. 24 | 25. 71 |
| | | $68. 95 |

| | |
|---|---|
| Classifying U.S. Goods Retd item 800.00 on | $33. 56 |
| Apply TSUS item no and rate on diffns | 35. 39 |
| total | 68. 95 |

Plaintiff's final exhibit, numbered 7, consists of the affidavit of Kenneth D. Wallis, managing director of Waltek, Ltd. This commendably thorough affidavit confirms the testimony given by Mr. Larson with regard to the history of the relationship between plaintiff and Waltek. Mr. Wallis gives the following figures in that section of his affidavit dealing with the cost of production:

▄▄▄▄

## Memory Planes – Inner Frame

Exported materials:
| | | |
|---|---|---|
| Cores | $28. 67 | |
| Printed Circuit Board | 5. 26 | |
| Wire | . 008 | |
| | | $33. 938 |

Assembly costs:
| | | |
|---|---|---|
| Direct Labor | $1. 85 | |
| Overhead | 4. 48 | |
| G&A | 2. 28 | |
| Profit | 6. 05 | |
| Total costs | | $14. 66 |

## Memory Planes – Outer Frame

Exported materials:
| | | |
|---|---|---|
| Cores | $28. 67 | |
| Printed Circuit Board | 5. 59 | |
| Wire | . 008 | |
| | | $34. 268 |

Assembly costs:
| | | |
|---|---|---|
| Direct Labor | $1. 85 | |
| Overhead | 4. 48 | |
| G&A | 2. 28 | |
| Profit | 6. 05 | |
| Total costs | | $14. 66 |

## Extended Memory Core Mats

Materials exported:
| | | |
|---|---|---|
| Cores | $1, 499. 14 | |
| Wire | . 92 | |
| | | $1, 500. 06 |

Assembly charges:
| | | |
|---|---|---|
| Direct Labor | $32. 24 | |
| Overhead | 78. 13 | |
| G & A | 39. 62 | |
| Profit | 40. 01 | |
| | | $190. 00 |

| | |
|---|---|
| Total costs | $1, 690. 06 |

As always in customs litigation, and particularly in reappraisement proceedings by virtue of the statutory presumption, the burden is on the plaintiff to disprove the value found by the appraiser and prove the value for which he contends. Frequently, plaintiff satisfies this dual task in a single step such as may be the case when it contends that export value should supplant constructed value as the basis of valuation. Since export value is given preference by the statute proof of its existence will automatically remove other methods of valuation from consideration. Less frequently a direct attack is made on the method used by the appraiser as a prelude to proof by plaintiff.

In the instant case both methods of dispute are used. Plaintiff attempts to prove the existence of an export value for the importations at issue and also attacks the valuation procedure utilized by the import specialist. Due to the potentially conclusive nature of the attemped proof of export value, it will be discussed first.

Defendant herein has made a fundamental argument which, if correct, will preclude plaintiff's proof of export value at the outset. Defendant argues that where the transaction in question is not a sale there can be no export value. Defendant points out that Waltek at no time acquired title to the materials of manufacture and was paid only for the service of assembly. According to this argument neither Waltek nor the other firms engaged in similar activities, concluded any sales of merchandise and hence can offer no proof of export value.

I am inclined to reject this argument in this particular situation because I do not feel it is in consonance with the special provisions of item 807.00, *supra*, and with the general intent of tariff legislation to provide for the valuation of all articles imported into the United States. Valuation under section 402 and 402(a) for merchandise which is the subject of item 807.00 is virtually unobtainable if the statute in each instance is strictly construed. Yet a valuation was contemplated by item 807.00 and such valuation, we must assume, would be a *statutory* valuation and not one which rests in the discretion of the appraising officer.

The principal difficulties of this case arise from a disharmony between provisions of item 807.00 and the valuation provisions. This can be traced to a lack of legislative clarification of the working relationship between these two provisions. While judges do their utmost to interpret the law in light of their views of legislative intent, the more appropriate solution may be a more explicit delineation of Congressional intent by the legislators themselves who, in their wisdom, may see fit to perfect the language of the provisions involved herein.

Under the unusual situation that exists herein the absence of sales does not *ipso facto* preclude a finding of export value. However, the

evidentiary insufficiencies of the record, particularly with regard to the extent to which the price to a selected purchaser fairly reflects the market value, necessitates a finding that an export value does not exist.

We remain therefore with the dispute involving constructed value. It will be recalled that the method used by the appraising official was to calculate percentage which the assembler's profit was of the assembler's expenses and using this as the percentage of profit apply it to the sum of the assembler's expenses and the cost of materials. This procedure resulted in an amount for profit which was, to say the least, considerable.

Such computation is improper. It does not conform to the method laid out in the provision for cost of production. It is tantamount to circumventing the intent of item 807.00 and it is illogical and unrealistic. In short it is not designed to yield the "full value" called for since it yields an inflated value which does not conform to the realities of the situation.

It is to be noted there is no dispute here regarding the fact that the above is the method used herein by the appraising official and furthermore that throughout his computations he utilized the figures supplied by plaintiff for cost of materials, general expenses and profit. The sole dispute relates to his manipulation of Waltek's profit, in creating from it a percentage figure and then arriving at an amount for profit by applying this percentage to the entire sums including the cost of the American components.

It is obvious that the assembler had no expenses for the material components and merely bore the expenses of assembly. The percentage which his profits bear to his expenses will be much larger than if he were the actual manufacturer and had to purchase the materials. For this reason it is totally unrealistic, in recreating or simulating the cost of production, to generate a percentage in this manner. This results in the anomaly of an amount for profit greater than the total actual cost of assembly and profit.

Defendant, in its brief asserts that "the appraising official found an amount of profit which would have been realized had there been a cost of materials incurred by the exporter." This commendable sentiment is precisely what was *not* done here.

The appraising official began without considering the cost of materials at all. He first determined a percentage of profit by dividing the total costs (direct labor, overhead, general and administrative expenses) into the profit. He then, for the first time, brought cost of materials into consideration by applying said profit percentage to the total sum of cost of component materials, freight, direct labor and general expenses. Thus his procedure in determining the profit per-

centage was inconsistent with his later application of that percentage. Had the appraising official been treating the assembler as a manufacturer, as would have been the proper procedure, he would never have computed a profit percentage by ignoring cost of materials entirely. This is a fundamental error in the ascertainment of an amount for profit since the *percentage* was generated *without* regard for cost of materials and then an amount arrived at with full regard for cost of materials.

One of ironies of this method of computation is that it places the present importer in a worse position when he is supplying the components than if he were to purchase the entire completed article from the assembler. In effect what was done here is actually very close to the levying of duty on the cost of materials, directly contrary to the provisions of item 807.00. The procedure used has the effect of expanding the value of the article by amounts directly related to the cost of materials making the later elimination of the cost of American materials a meaningless act.

Although I have expressed the view that the action of the appraising official in this matter was incorrect, it remains part of the plaintiff's burden to prove the value for which it contends. In this respect, plaintiff is entitled to rely on those figures in the appraisement to which the presumption of correctness still attaches. In this case, it is only the method of computation used by the appraising official which has been rejected. The underlying figures for cost of materials, general expenses and profit are not in dispute with regard to the inner and outer memory planes. These figures were supplied by the plaintiff and utilized by the appraising official as demonstrated by plaintiff's collective exhibit 5 and exhibit 6. They remain presumptively correct and should serve as the elements of constructed value.

I note that were it not for the presumption of correctness still attaching to the elements of constructed value, plaintiff would have fallen short of the necessary proof. I refer to the need for diligence in attempting to show that the amount of profit is one which is usually reflected in sales by producers of merchandise of the same general character. This is a genuine requirement of the statute, which though it may at times be considered unrealistic, remains in full force and effect.

Plaintiff argues that it has shown diligent efforts by reason of the inquiries contained in plaintiff's collective exhibit 3. It is evident however from the testimony of the witnesses, the affidavit of Mr. Wallis and the responses to said inquiries, that the firms actually engaged in the activity concerning which the inquiries were directed are the parent companies. Such inquiries do not constitute the diligence

required by this court since such inquiries should have been directed to the subsidiaries. *N. M. Albert Co., Inc., et al.* v. *United States,* 59 Cust. Ct. 788, R.D. 11417 (1967), affirmed 62 Cust. Ct. 1029, A.R.D. 254 (1969).

As to the extended memory core, the record does not contain the same commendable detail regarding the method of appraisement nor is there any firm indication that the method utilized was the same as that discussed above. Accordingly, consideration of plaintiff's claims regarding them cannot advance as far as the discussion regarding memory planes.

In light of the above considerations, I find that constructed value of the inner and outer memory planes should be computed by totalling the cost of materials, labor, general expenses and profit as set forth in plaintiff's exhibit 7. The resulting values are $48.59 for the inner plane and $48.92 for the outer plane.

## Findings of Fact

1. The imported merchandise herein consists of certain inner and outer memory planes and extended core mats which were exported from Hong Kong by Waltek, Ltd., during a period of November 1965 to October 1966.

2. The said merchandise does not appear on the final list, T.D. 54521.

3. The said merchandise was appraised on the basis of constructed value as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. At or about the time of exportation, such or similar merchandise was not freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual quantities and in the ordinary course of trade for exportation to the United States.

5. At or about the time of exportation, such or similar imported merchandise was not freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, in the usual wholesale quantities and in the ordinary course of trade.

6. That the figures used in computing the value of the inner and outer memory planes were supplied by the plaintiff and are not essentially in dispute between the parties.

7. That the method used by the appraising official to arrive at constructed value was erroneous.

8. Plaintiff has successfully proven the elements of constructed value for the inner and outer memory planes.

9. Plaintiff has failed to prove any value other than the appraised value for the extended memory core mat.

### Conclusions of Law

1. Constructed value as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of valuation.

2. The value of the inner and outer memory planes is that set forth in the body of the opinion.

3. The appraised value is the value of the extended memory core mat.

Judgment will be entered accordingly.